UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:11 CR 538 JAR / DDN |
| ) | |
| MARK WUNDERLI, ) | |
| ) | |
| Defendant. ) | |

**ORDER AND RECOMMENDATION**

The pretrial motions of the parties were referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b).

Pending are the motions of defendant Mark Wunderli to suppress evidence (Docs. 10, 22, 23) and for pretrial disclosure of information and evidence (Docs. 24, 25), and the motions of the United States for a determination of the admissibility of any arguably suppressible evidence (Docs. 11, 17). An evidentiary hearing was held on February 16, 2012. A transcript of the hearing was ordered and filed. (Docs. 28, 33.) The parties requested and were granted extensions of time to file post-hearing memoranda. (Docs. 31, 34, 35, 37.)

**Motions for Pretrial Discovery**

Defendant Wunderli has moved for disclosure of favorable, exculpatory, and impeaching information. (Doc. 24.) Defendant seeks 16 categories of information, invoking Brady v. Maryland, 373 U.S. 83 (1963)(holding the due process clause of the Constitution requires the prosecution to disclose to the defense upon request evidence favorable to defendant when such information relates to guilt or punishment), Giglio v. United States, 405 U.S. 150 (1972)(holding due process requires the prosecution to disclose to the defense information relevant to impeachment of a prosecution witness), and the Jencks Act, 18 U.S.C. § 3500 (limiting disclosure of statement or report made by a government witness, other than the defendant, to disclosure only after the witness has testified on direct examination).

In response to the motion and during the hearing, counsel for the

government stated that the government is aware of its duties under Brady and Giglio and that, if any such information exists, it will be disclosed to defendant in a reasonable time for effective use at trial. (Doc. 26 at 12.) This response moots the relief sought by defendant. Therefore, the motion is denied without prejudice as moot.

Defendant has moved for production of government memoranda relating to witness interviews and for an order that the government direct its investigators to preserve their rough notes of interviews. (Doc. 25.)

In response to this motion, counsel for the government has stated that the case agents assigned to this case have been directed to preserve any such materials. (Doc. 26 at 11.) At the hearing on this matter, counsel restated that such a direction to the agents was given. Defense counsel did not challenge the accuracy of these statements. Therefore, as a basis for an order for the same relief, the motion is moot. The motion is denied without prejudice as moot.

**Motions to Suppress**

Defendant Wunderli has moved to suppress the physical evidence seized in the search of his residence (Doc. 22) and to suppress the statements he made to the police (Doc. 23). From the evidence adduced at the hearing, the undersigned makes the following findings of fact and conclusions of law:

**FACTS**

1. For some time prior to September 9, 2010, St. Louis County Police Sergeant Adam Kavanaugh engaged in and supervised undercover internet investigations of the possession and distribution of child pornography. Prior to September 9, 2010, Sgt. Kavanaugh developed information about specific child pornography activity in St. Louis County and assigned the investigation to St. Louis County Police Detective Edward Jeffrey Roediger. Sgt. Kavanaugh gave Det. Roediger the Internet Protocol (IP) address of a computer that was involved in child pornography.

2a. On September 9, 2010, Det. Roediger used the information provided by Sgt. Kavanaugh to apply to St. Louis County Associate Circuit

Judge John R. Essner for a search warrant for 3031 Ventnor Place, in the city of Florissant, which is in St. Louis County, Missouri. In support of the application, Det. Roediger submitted his sworn, written affidavit. In his affidavit, he stated that depictions[1] of child pornography, electronic storage devices[2] for these depictions, and evidence[3] related to such depictions are being kept and secreted on the premises of 3031 Ventnor Place. Gov. Ex. 1, Affidavit at 1.

2b. Det. Roediger's affidavit described the probable cause facts in several enumerated paragraphs. The affidavit described Det. Roediger's extensive police experience and training, which included investigations in child pornography matters. It described Sgt. Kavanaugh's extensive police experience and training, especially including internet investigation of child pornography matters. The affidavit described Sgt. Kavanaugh's investigation that led to the issuance of this search warrant application. Sgt. Kavanaugh investigated public file sharing "peer-to-peer" networks and IP addresses previously involved in child pornography. In this investigation, at a stated time on May 5, 2010, he located a computer that offered to share with the public images of child pornography. He identified this computer by its IP address, xx.xx.xxx.172.

2c. The affidavit stated that Sgt. Kavanaugh connected to this computer and determined that it contained files known to law enforcement

---

[1] The affidavit stated that such depictions were "[p]hotographs, files and graphic images." Gov. Ex. 1, Affidavit, at 1.

[2] The affidavit stated that such devices were "electronic data processing and storage devices, computers and computer systems . . . modems, routers and other wireless devices; any and all cameras and related equipment, video and audio recorders and all related recording equipment . . . ." Id.

[3] Such evidence was described in the affidavit as "any and all logs containing user names, passwords and documentation or other identifiers necessary to examine or operate items; together with system documentation, operating logs and handwritten notes related to user identifications, passwords and/or child pornography[.]" Id.

to contain child pornography by their "HASH value[s]."[4]  The files' HASH values were listed in the affidavit and their contents were briefly described; the descriptions indicated child pornography.

    2d.  Det. Roediger's affidavit stated that on July 29, 2010, he himself viewed files with these HASH values and found that they contained the images previously described in the affidavit.  The affidavit also stated that, from information provided on May 18, 2010, in response to a subpoena to the relevant internet services provider, the subject IP address was assigned to Mark Wunderli with a service and billing address of 3031 Ventnor Place in Florissant, Missouri.  A check of the electric utility's records indicated that the electrical service to 3031 Ventnor Place was registered to Mark Wunderli, with active service since April 1989.

    2e.  The affidavit described generally Sgt. Kavanaugh's law enforcement internet peer-to-peer networking training.  It also described the greater than 99.9% certitude in the identity of digital files' content based upon the files' digital signatures.  The affidavit described, from Det. Roediger's training and experience, generally that computers using the internet identify each other by their IP addresses, how people who exploit children deal and communicate with one another, how they extensively use computers and related equipment and software in dealing with images of child pornography, and how they use the internet to traffic in child pornography.  The affidavit described how HASH values are unique to the content of digital files and that, if the content of a file changes, the HASH value of that file also changes.

    3.  Based only upon Det. Roediger's application and affidavit, Judge Essner signed and issued the search warrant for 3031 Ventnor Place, Florissant, Missouri, on September 9, 2010, at 2:30 p.m.  The affidavit and the search warrant did not describe any specific area within 3031 Ventnor Place that was to be searched.  Gov. Ex. 1, Search Warrant at

---

[4]The affidavit does not state whether Sgt. Kavanaugh viewed the images of child pornography on the subject computer's own software or hard equipment or whether the files he viewed were on another computer that had files with the same HASH values as files known to law enforcement as containing images of child pornography, and which were the same HASH values as those on the subject computer.

1-2.

4.      Det. Roediger, Sgt. Kavanaugh, and four other detectives determined to execute the search later on September 9. Before going to the location to be searched, they met with an eight-member squad of the St. Louis County Police Tactical Operations Unit (TOU). The TOU members, dressed in special tactical gear, were responsible for gaining entry to the location to be searched and were responsible for securing it for the investigating officers to enter and search. All of the officers present were armed. Before the search warrant was executed, the police did a criminal record check of Wunderli and found that he had no criminal history.

5.      At approximately 7:00 p.m. on September 9, 2010, the officers went to 3031 Ventnor Place to execute the warrant. TOU personnel knocked on the front door of this residence. Because there was no response to the knock within a reasonable period of time, the TOU entered the residence by force and secured it. The residence was unoccupied.

6.      Thereafter, the investigating officers entered and systematically searched the residence at 3031 Ventnor Place for the items listed in the warrant. During the search, the officers seized eleven categories of items, including 10 tower-type computers and 2 laptop computers. See Gov. Ex. 1, Amended Return and Inventory. Many seized items, including cameras, were thereafter returned to defendant Wunderli.

7.      Shortly after entry was made, Det. Roediger phoned a known telephone number for Mark Wunderli. Det. Roediger told the person who answered the call that he was a police officer trying to reach Mark Wunderli and that he should phone him at the number the detective provided. Soon thereafter, Det. Roediger received a phone call from a man who identified himself as Mark Wunderli. Det. Roediger identified himself as a St. Louis County police officer, and told him that the police were at his residence to investigate a break-in at his residence. Det. Roediger asked Wunderli to come to the residence. Wunderli said he would do so.

8.      Soon thereafter, and after the TOU squad had left, Wunderli drove up in a vehicle with his girlfriend. Det. Roediger met Wunderli on the front lawn of the residence. Occasionally Sgt. Kavanaugh would

join them on the lawn and then return inside the residence. Roediger told Wunderli that he was not under arrest.[5] Det. Roediger told Wunderli that the police were there investigating child pornography. He then asked Wunderli if he knew about Lime Wire or Frost Wire, or any other peer-to-peer computer sharing network. Wunderli initially answered no, but shortly thereafter said he had had Line Wire on his computer for a short period of time. Wunderli made other oral statements about child pornography and his computer. Det. Roediger asked Wunderli who else lived at the residence. Wunderli said only he and his son Matthew lived there, Matthew living in the lower level of the residence and he himself in the upper level. In this conversation, Wunderli made statements about child pornography being on his computer, about applying biblical statements to websites that contained child pornography, and about looking for pictures of nude children.

9. During this conversation on the lawn outside the residence, Det. Roediger did not physically or otherwise coerce Wunderli to talk with him. Wunderli understood what Roediger was saying. Wunderli acted in a cooperative manner, appeared to have at least average intelligence, and did not appear to be nervous or intoxicated. Mostly Det. Roediger spoke with Wunderli in this conversation, although Sgt. Kavanaugh occasionally came out of the residence and was present. At no time did Det. Roediger or Sgt. Kavanaugh draw their weapons. At no time during the conversation did any officer tell Wunderli that there would be consequences to cooperating or not cooperating with the police. No promise or misrepresentation was made to induce Wunderli to speak with the officers.

10. Det. Roediger asked Wunderli if he would accompany him to the St. Louis County Police Headquarters for further interview and investigation, and to record the interview. Roediger told him again that he was not under arrest. Det. Roediger made no misrepresentation, threat, promise, or statement about any consequences for cooperating or not, to get Wunderli to accompany him to the police station. Wunderli

---

[5]At no time during this conversation on the lawn of the residence did the officers tell Wunderli that he was free to leave or advise him of his constitutional rights to counsel or to remain silent.

said he would do so.

     11.   Det. Roediger drove Wunderli to the police station in a police vehicle. Det. Roediger did not expressly give Wunderli the option of driving himself to the police station, but he did tell Wunderli that an officer would drive him home later. Wunderli was not handcuffed at any time in the vehicle. Police regulations at that time called for a passenger not under arrest to be patted down for weapons before entering a police vehicle for transportation.[6] During this approximately 25 minute drive to the police station, Det. Roediger and Wunderli engaged in small talk about Wunderli opening a restaurant. Also, Wunderli said to himself, not in answer to any question by the officer, but loudly enough for the officer to hear, that he was trying to think what else could be on the computer, because he knew the police would find it.

     12.   At the county police headquarters building, Det. Roediger and Wunderli went to the second floor, into an open, roll call area of the Bureau of Criminal Investigation. While he was seated there and while Det. Roediger was initiating paperwork, Wunderli received an electronic message on his cell phone, which he had on his person. After reading the message, Wunderli requested that an attorney be present before there was any further questioning. Thereafter, Det. Roediger did not further question Wunderli.

     13.   About the time Wunderli requested the presence of counsel, Det. Roediger received a phone call from Sgt. Kavanaugh stating that the police had found in the residence printed-out hard-copy pictures of what the police believed were images of child pornography. Sgt. Kavanaugh told Det. Roediger to formally place Wunderli under arrest. Det. Roediger did so and then placed Wunderli in the custody of Det. Slaughter for transportation to the St. Louis County Justice Center for incarceration.

     14.   While Wunderli was with Det. Slaughter, Det. Roediger received another phone call from Sgt. Kavanaugh. Sgt. Kavanaugh told Det. Roediger that the police had discovered that they had left some of their

---

[6]The hearing testimony is not sufficient for the undersigned to find that Wunderli actually was or was not patted down at this time.

evidence identification equipment on the premises of 3031 Ventnor Place. So, Det. Roediger contacted Det. Slaughter and had him ask Wunderli if he would sign a Consent to Search form so the police could reenter the searched premises to retrieve the police equipment.

15. Det. Slaughter handed Wunderli a Consent to Search form, Government Exhibit 2. The form bore the handwritten information of the date ("9.9.2010"), the time ("10:45 PM"), the location the form was presented ("INTAKE [area of the jail]"), defendant's name, the place to be searched ("3031 Ventnor Plc."), and the purpose of the form ("Search Residence For Items Left Behind In Search Warrant"). Wunderli signed the form. Gov. Ex. 2. No threats or promises were made to get him to cooperate and sign the form.[7]

**DISCUSSION**

**Motions to suppress physical evidence**

In support of his motions to suppress the physical items seized pursuant to the search warrant, defendant argues that the affidavit did not supply the issuing judge with probable cause for the issuance of the warrant, that the scope of the warrant and the information in the supporting affidavit were general in nature, that the warrant did not specify places within the residence to search, and that the police engaged in a general search of the 3031 Ventnor Place without authorization.

The Fourth Amendment to the Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." U.S. Const. amend. IV. To secure these rights, the Fourth Amendment provides "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and the persons or things to be seized." Id. The goal of the Fourth Amendment is to ensure that a search will be carefully tailored to its justifications and will not become a wide-ranging exploratory search.

---

[7]At the evidentiary suppression hearing, counsel for the United States stated that the government would not offer in its case-in-chief any of the items retrieved from 3031 Ventnor Place pursuant to the Consent to Search form.

Maryland v. Garrison, 480 U.S. 79, 84 (1987).

The issue before this court when reviewing the validity of the issuance of a search warrant by another court is whether the supporting materials gave the issuing judge a substantial basis for concluding that probable cause existed for the issuance of the warrant. United States v. Stevens, 439 F.3d 983, 987 (8th Cir. 2006). Probable cause means a "fair probability that . . . evidence of a crime will be found in a particular place," given the circumstances set forth in the affidavit." United States v. Horn, 187 F.3d 781, 785 (8th Cir. 1999) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

In spite of defendant's arguments about the breadth of the scope of the search warrant in this case, because of the nature of probable cause, see United States v. Cartier, 543 F.3d 442, 446 (8th Cir. 2008)(stating the existence of probable cause depends upon "the totality of the circumstances indicating that it is fairly probable, not certain, that the contraband will be found at the place to be searched"), the identity of files' HASH values sufficiently identified files as child pornography contraband on the computer with the subject IP address. Id. at 447; see also United States v. Harner, No. 09-CR-0155 (PJS/FLN), 2009 WL 2849139, at * 3 (D. Minn. Sept. 1, 2009)(holding affidavit established probable cause even if officer had not viewed contraband file from subject computer).

Defendant argues, in effect, that the scope of the warrant and the execution of it were not tailored to the probable cause in the affidavit. The undersigned disagrees.

The search warrant authorized the police to search the residence at 3031 Ventnor Place without limitation to any specific physical area within the residence. This description comported with the affidavit's probable cause information that indicated the probability that the computer, a portable item, with the xx.xx.xxx.172 IP address was located somewhere inside this residence.

The particularity requirement of the Fourth Amendment was satisfied, because the warrant identified the types of property authorized to be seized. Horn, 187 F.3d at 788. The proper application of this principle depends on the circumstances of the investigation and the type of items

involved.  Id.  And a search warrant can authorized the seizure of a "generic class of items," if the specific items or digital devices cannot be more specifically identified.  Id.  In this case, the search warrant authorize the police to seize many types of electronic and other devices capable of being used in the possession and distribution of child pornography[8] images, the renderings of such images, and the records thereof, wherever in the residence at 3031 Ventnor Place they may be found.  To the extent digital electronic equipment other than the computer that bore the xx.xx.xxx.172 IP address was seized and searched, Det. Roediger's affidavit described the nature of trafficking in child pornography and stated in ¶¶ 16-20, from his training and experience, that persons who possess or traffic in images of child pornography use many types of electronic devices and items, described in the affidavit and in the search warrant, to do so.

Therefore, the affidavit provided the issuing judge a substantial basis for finding probable cause to seize the computer with the subject IP address and to seize the other devices that were seized, even those that were returned by the police to defendant.

Finally, even if the scope of the warrant was somehow overbroad and the warrant improperly issued, the motion to suppress should be denied on the basis of United States v. Leon, 468 U.S. 897 (1984).  The officers' reliance on the search warrant in this case was not objectively unreasonable, because the supporting affidavit has not been shown to contain a false or recklessly made statement, there is no evidence that Judge Essner abandoned his judicial role when he issued the warrant, the supporting affidavit did not lack indicia of probable cause sufficient to render Judge Essner's reliance on it unreasonable, and the warrant was not facially deficient such that the officers could not have presumed it was valid. United States v. Grant, 490 F.3d 627, 632-33 (8th Cir. 2007).

---

[8]The search warrant specifically and graphically defined what "child pornography" images would include.

**Motions to suppress statements**

Defendant argues that his statements to the police should be suppressed because they were not voluntary and because they were not preceded by him being read his <u>Miranda</u> rights. The only statements described in the record to which the motion applies are the oral statements defendant made on the lawn outside his residence and the oral statements he made in the police car en route to the police station.

The Fifth Amendment to the Constitution protects an individual from being compelled to be a witness against himself. U.S. Const. amend. V. To safeguard an individual's Fifth Amendment rights, a suspect in custody must be warned before being interrogated that he has the right to remain silent and that any statement he makes may be used against him. <u>Miranda v. Arizona</u>, 384 U.S. 436, 444, 461 (1966); <u>United States v. Vinton</u>, 631 F.3d 476, 481 (8th Cir. 2011). The requirements of <u>Miranda</u>, however, are triggered "only when a defendant is both in custody and being interrogated." <u>United States v. Head</u>, 407 F.3d 925, 928 (8th Cir. 2005). The government bears the burden of establishing the constitutional admissibility of a defendant's statements by a preponderance of the evidence. <u>United States v. Boslau</u>, 632 F.3d 422, 429 (8th Cir. 2011). The government argues that defendant was not in custody for <u>Miranda</u> purposes when he made his statements to the police and that his statements were voluntary.

The <u>Miranda</u> in-custody issue is answered by whether defendant had been formally placed under arrest or whether his freedom of movement was restrained to a degree that is associated with a formal arrest when he made the statements. <u>Cartier</u>, 543 F.3d at 448. In this case, where it is clear that defendant was not formally arrested, only the latter factor applies.

In the totality of the circumstances of this case, defendant was not in circumstances that are associated with a formal arrest. The fact that Det. Roediger falsely told defendant that his residence had been broken into, is one that in the context of other circumstances could lay the groundwork for finding a limitation of movement associated with a formal arrest. However, such is not the case here, for two reasons. First, to tell defendant over the phone that his residence is being searched by the

police pursuant to a warrant for evidence of criminal activity would have been to empower defendant with information to either act contrary to the security of the police or to destroy evidence. Cf. United States v. Johnson, 528 F.3d 575, 579 (8th Cir. 2008)(holding that "the resident of a home subject to a search warrant may be detained so as to prevent flight, minimize the risk of harm to the officers, and allow the officers to conduct an orderly search").

Second, after defendant arrived at his residence, he was immediately told what the actual circumstances were and that he was not under arrest. Defendant understood what was happening. No fact indicated that he believed he could not leave. He had arrived with a companion and he had his own vehicle available to him. Pressured perhaps by what he knew was on his computer, he did not attempt to leave. He remained in circumstances that were not the equivalent of a formal arrest. Therefore, he was not in custody for Miranda purposes and the police did not have to read him his constitutional rights before asking him questions.

Nor were his statements involuntary. Statements are constitutionally involuntary if they are the result of government overreaching, such as physical mental or physical coercion, deception, or intimidation. Colorado v. Connelly, 479 U.S. 157, 169-70 (1986); Moran v. Burbine, 475 U.S. 412, 421 (1986); United States v. Jordan, 150 F.3d 895, 898 (8th Cir. 1998).

Defendant argues his statements were involuntary because the police obtained them by tricking him into incriminating himself by saying he was not under arrest while they intended to arrest him later in the operation; because of the number of police officers present; and because of the confined circumstances of the ride in the police car. While the police initially deceived him into believing his residence had been broken into, in an effort to get him to come to the residence, as soon as he arrived, Det. Roediger told him the truth about the execution of the search warrant. Thereafter, no promise, intimidation, threat, or coercion was used to get defendant to make his oral statements. Nothing about the circumstances of the ride to the police station indicated that defendant had been coerced into making any statements.

The number of officers present at his residence was not so large as to intimidate defendant and to render his statements involuntary. By the time defendant arrived at his residence, the police tactical squad had left. Only the six investigating detectives remained on the scene. Only two of the six had direct contact with defendant, Det. Roediger and Sgt. Kavanaugh. Of these two, only Det. Roediger was with defendant during the whole conversation; Sgt. Kavanaugh participated in the conversation occasionally, when he was not otherwise inside the residence. Nothing in the record indicated that any officer acted in a way that coerced defendant. United States v. Lee, 356 F.3d 831, 834-35 (8th Cir. 2003).

Finally, defendant's oral statement to himself in the police vehicle, which was loud enough to be overheard by Det. Roediger, should not be suppressed because it was not the result of police interrogation, United States v. Turner, 157 F.3d 552, 556 (8th Cir. 1998), and it was not constitutionally involuntary because it was not coerced.

For these reasons,

**IT IS HEREBY ORDERED** that the pretrial motions of defendant Mark Wunderli for pretrial disclosure of information and evidence (Docs. 24, 25) are denied without prejudice as moot.

**IT IS FURTHER ORDERED** that the pretrial motions of the government for a determination of the admissibility or not of any arguably suppressible evidence (Docs. 11, 17) are denied as moot.

**IT IS HEREBY RECOMMENDED** that the motions of defendant Mark Wunderli to suppress evidence (Docs. 10, 22, 23) be denied.

The parties are advised they have until close of business on April 13, 2012, to file written objections to this Order and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

            /S/  David D. Noce
           **UNITED STATES MAGISTRATE JUDGE**

Signed on March 27, 2012.